## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EDUCATION CORPORATION OF AMERICA, | Case No. 20-10034 (BLS) |
| Alleged Debtor. | **Hearing Date:  TBD**<br>**Objection Deadline:  TBD** |

## MOTION OF PETITIONING CREDITORS FOR
## APPOINTMENT OF A CHAPTER 11 TRUSTEE

Monroe Capital Credit Fund II LP ("Monroe"), Reputation Partners LLC, and BSF Richmond, LP (collectively, the "Petitioning Creditors"), by and through undersigned counsel, hereby submit this motion (the "Motion") for the appointment of a chapter 11 trustee of the above-captioned alleged debtor ("ECA").  In support thereof, the Petitioning Creditors respectfully state as follows:

### PRELIMINARY STATEMENT

1.      When a for-profit education company is in distress and needs to be rescued, the single most important decision to be made is the selection of an experienced and qualified restructuring professional to oversee the effort.  In such a situation, a receiver is required because the company will lose its federal Title IV funding if it files for chapter 11 protection.  When a receivership for ECA became an immediate and urgent necessity to save ECA, ECA, in consultation with Monroe, took pains to identify qualified restructuring professionals with experience in the education industry and working with the Department of Education ("DOE").  ECA agreed on those candidates. On November 6, 2018, ECA commenced the Receivership (defined below) and requested that one of the agreed upon receiver candidates be appointed.  Instead, the District Court (as defined below) presiding over the Receivership disregarded ECA's

proposed candidates and appointed the Receiver, a local politician without any experience with for-profit education companies.  The Receiver was appointed without any input from ECA or its creditors.

2.      What has followed in the Receivership has been unfortunately predictable.  At the time the Receiver was appointed, ECA intended to sell certain of its financially viable campuses on a "go forward" basis as part of a restructuring plan to maximize the value of ECA's enterprise for the benefit of its creditors and stakeholders. The Petitioning Creditors believe that the value of ECA's assets shorty before the Receiver was appointed was approximately $154.3 million. However, the Receiver faced immediate and urgent deadlines with the DOE to maintain Title IV funding. The Receiver failed to meet those deadlines, and ECA and almost all of its subsidiaries lost access to their funding and had to cease operations and liquidate.

3.      The situation never improved. The Receiver has been an abject failure who, rather than serve as a fiduciary to creditors, has through lack of experience, oversight, deliberate inaction and incompetence presided over the loss of millions of dollars in value that could have been obtained for ECA's creditors.  But now that the Receivership is near an end, after all of ECA's hard assets have been liquidated, the Petitioning Creditors were forced to act to protect their interests before the Receiver could jeopardize recovery on ECA's single largest asset—valuable litigation claims against ECA's officers and directors (the "D&O Claims).  As set forth herein, the Receiver has inexplicably delayed pursuing the D&O Claims and has instead chosen to align himself with the target of such claims, and their insurers, rather than the very creditors to which he owes fiduciary duties. Put simply, enough is enough.

4.      At this point only the Receiver and his professionals are benefitting from the Receivership.  ECA has been liquidated; the Receiver will not aggressively pursue the D&O

Claims; and the Receiver will not make any distributions to creditors. Other than a modest amount of spending on operating expenses to preserve documents, the Receiver and his professionals intend to consume all of ECA's remaining cash to pay for their own fees in an attempting to thwart this chapter 11 case and to stop the Petitioning Creditors from pursuing the D&O Claims. The Petitioning Creditors have commenced this chapter 11 case so that a proper estate fiduciary can be appointed to ensure proper liquidation of ECA's most significant remaining asset.

**JURISDICTION**

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The legal predicate for the relief requested herein is 11 U.S.C. § 1104(a).  The Petitioning Creditors confirm their consent, pursuant to rule 9013-1(f) of the Local Rule of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

**FACTUAL BACKGROUND**

I.     **ECA's Operations and Appointment of Receiver**

6.     ECA previously operated as a for-profit college, whose student population largely consisted of nontraditional students, such as unemployed and underemployed adults, who were seeking to obtain job skills to find employment or to change careers.

7.     Monroe Capital Management Advisors, LLC ("Agent"), an affiliate of Monroe, is the senior secured lender to ECA pursuant to that certain 8th Amendment to the Credit Agreement

3

(as amended from time to time, the "Monroe Credit Agreement") by and between Agent, as administrative agent and collateral agent, and each of the lender parties thereto, and ECA.

8.      Agent has a first priority and perfected security interest in all of ECA's assets, including without limitation, accounts receivable, general intangibles and all proceeds therefrom.

9.      On October 5, 2018, VC Macon, GA, LLC, a landlord who leased space to ECA in Macon, Georgia, filed a civil action against ECA, Virginia College, LLC and New England College of Business and Finance, LLC (collectively, the "Receivership Entities") and commenced the civil action styled *VC Macon, GA LLC v. Virginia College LLC*, CA 5:18-cv-00388-TES et al. pending in the United States District Court for the Middle District of Georgia (the "Receivership").

10.      On November 6, 2018, the Receivership Entities filed an *Emergency Motion for the Appointment of a Receiver and Entry of a Temporary Restraining Order and Preliminary Injunction* (the "Receivership Motion") seeking the appointment of a receiver in the Receivership. John F. Kennedy, was appointed receiver of ECA ("Kennedy" or the "Receiver") and affiliated Receivership Entities pursuant to an Order dated November 14, 2018 (the "Receivership Order").

11.      At the time of filing the Receivership Motion, ECA was operating seventy-four (74) campuses across twenty (20) states, with approximately 20,000 students enrolled therein. As of October 5, 2018, ECA owed Monroe and its lenders approximately $19 million under the Monroe Credit Agreement, and had unsecured debt of approximately $46,773,000.00.

12.      Approximately 85% of ECA's students paid their tuition through some form of federal aid under Title IV of the Higher Education Act of 1965 ("Title IV"). Many of those students were not able to pay the costs of their college education without the access to these funds. ECA took the extraordinary step of placing itself into receivership, rather than filing a bankruptcy petition, in order to preserve the ability of its students to access funding under Title IV. Those

4

funds were also the primary source of revenue for ECA. Had ECA filed for bankruptcy protection, it no longer would have been an "eligible institution" and would have lost access to Title IV funding. *See* 20 U.S.C. § 1002(a)(4)(A) (defining an "eligible institution" as on that has not filed for bankruptcy).

13.    Neither VA Macon, GA LLC, nor any of the Receivership Entities proposed that Kennedy be appointed as the Receiver. Indeed, not a single creditor proposed Kennedy. ECA, after consultation with Monroe, proposed that the District Court select a receiver that had experience in the education industry; a professional that had a proven track record in the for-profit education space, and the respect of industry players, such as the DOE.

14.    The United States District Court for the Middle District of Georgia (the "District Court") rejected ECA's suggested receiver and, *sua sponte*, appointed Kennedy as the Receiver, despite the fact that Kennedy had no meaningful prior experience in the for-profit education industry.

## II.    The Receiver's Failures to Effectively Administer Assets After Appointment

15.    It became apparent almost immediately after the Receivership was commenced that the Receiver was not up to the task. The costs of the Receiver's inexperience administering a large, highly regulated estate were ultimately borne by creditors. Over the course of fourteen months, the Receiver failed to protect the assets and interests of ECA's Estate and maximize value for ECA's creditors. The Receiver's failures to appropriately manage ECA's estate and winddown ECA's business are, without limitation, discussed *infra*.[1]

---

[1]    The facts set forth herein do not constitute an exhaustive list of all the Receiver's shortcomings and mismanagement during the Receivership. The Petitioning Creditors acknowledge that the parties are engaged in briefing several motions regarding the propriety of this chapter 11 case and the appointment of a trustee, and that the parties intend to seek discovery during such briefing. All rights of the Petitioning Creditors are reserved.

**A.      The Receiver Fails to Develop Appropriate "Teach-Out Plans"**

16.      Two weeks before Kennedy was appointed the Receiver, the Accrediting Council for Independent Colleges and Schools ("ACICS") placed ECA's campuses on "show cause" status. Additionally, the DOE had informed ECA that it was required to develop "teach-out plans"[2] for those campuses it intended to close as part of its restructuring plan (as opposed to selling on a "go forward" basis).  ECA's deadline for developing "teach-out plans" was November 27, 2018.

17.      The DOE required that ECA develop "teach-out plans" in order to facilitate the orderly closure of campuses and outline how students could finish their programs of study.  These "teach-out plans" are a common and necessary feature of school closures and protect the interests of students, faculty and other stakeholders.  Additionally, the DOE conditions its public funding on a school's compliance with such "teach-out plans."

18.      Notwithstanding DOE's well-established requirements, and the fact that ECA, like all American colleges and universities, relied heavily on public funding, including financial aid under Title IV, Pell Grant benefits, GI Bill benefits and other funds, the Receiver failed to develop the appropriate "teach-out plans" for ECA's campuses by November 27, 2018, despite being appointed two-weeks prior to the deadline.  Approximately a week after failing to meet the deadline, the ACICS also suspended accreditation for ECA's institutions because, among other things, the Receivership Estate failed to demonstrate its ongoing ability to meet financial obligations.

19.      A day after the ACICS suspended accreditation, and with no "teach-out plans" in place, the Receiver inexplicably closed more than twenty-five campuses for two of ECA's primary

---

[2]      The term "teach-out" refers to an educational institution's obligation to continue educating students already enrolled at the institution prior to the closing of that institution. Applicable laws and regulations required ECA to deliver degrees to its students, even if a campus was closed.

institutions—Virginia College and Brightwood College.  The Receiver's unexpected closures left more than fifteen thousand students without an opportunity to continue or complete their education.  Moreover, the information the Receiver and ECA's management bluntly provided to these students was simply that they should "request their transcripts and contact local schools to determine transferability."

20.    The Receiver's precipitous decision to close campuses with no "teach-out plans" ultimately resulted in the DOE declining to provide further federal funds to ECA.  Thus, the Receiver failed to preserve ECA's most critical source of cash flow.  The Receiver's failure to work constructively with the DOE not only left ECA's campuses (i.e., assets of ECA's Estate) with little or no ongoing value, but it also undermined the very purpose of the Receivership.

## B.    The Receiver Exposes Debtor to Claims and Damages

21.    The Receiver's failure to protect ECA's Estate by working constructively with the DOE and complying with critical "teach-out" obligations negatively impacted other Estate assets and exposed ECA to claims and damages.

22.    The Receiver's decision to abruptly close ECA's campuses stripped thousands of students of their opportunity to complete their programs.  In fact, the Petitioning Creditors believe that many of these students still owe money to the federal government, despite having lost their opportunity to obtain their degree or certificate, and were unable to transfer their credits to another institution.

23.    Such harm to thousands of students did not go unnoticed. An illustration of the harm the Receiver caused is set forth in a letter from United States Senator Doug Jones, which was sent to ECA in December 2018 shortly after the Receiver's decision to close the schools.  The letter states, in pertinent part, the following:

7

*I am writing on behalf of the students in Alabama and across the country who are enrolled in one of Education Corporation of America's colleges, including Brightwood Career Institute, Brightwood College, Ecotech Institute, Golf Academy of America, and Virginia College. When the news broke yesterday regarding your decision to abruptly close these colleges, I was immediately concerned about the futures of 20,000 students enrolled nationwide in 20 states, including 4,000 veterans and military service members using the G.I. Bill.*

*In Alabama, Education Corporation of America's Virginia College campuses will close in Birmingham, Huntsville, Mobile, and Montgomery, leaving a combined total of more than 3,800 students in my state, including 670 student veterans who have been using the G.I. Bill benefits they have earned, left scrambling to figure out their educational future. According to your company's website, there will be information for students regarding transcript retrieval, transfer, and contact information that you "expect to start loading" on or around December 17, 2018.*

*After abruptly closing the doors, your decision to make students and families wait nearly two weeks to receive any information about their next steps is simply unacceptable.*

*You have a responsibility to these students, including our veterans and service members, to ensure they have all of the tools and information they need to move forward, including the choice between receiving a discharge of their federal student loans or transferring to a similar program if they can find an institution willing to accept their credits. Veteran students also need to understand the impact of the closure on their G.I. Bill benefit eligibility. I am deeply troubled by reports that many Education Corporation of America colleges have not been informing students of their right to seek a "closed school discharge" of their federal loan as is required by federal law under the 2016 "borrower defense" rule. Additionally, students who are encouraged to transfer should understand the limitations of fully transferring credits, and the impact on their eligibility for a loan discharge.*

*I urge you to do all you can to inform these students of their options. They have invested thousands of dollars into your institution and could potentially lose everything.*

A copy of Senator Jones' letter to ECA's CEO is attached as **Exhibit A**. Other legislators similarly expressed frustration with the Receiver's management. On December 19, 2018, Senator Elizabeth Warren and Representatives Elijah Cummings and Suzanne Bonamici signed a congressional letter that outlined Kennedy's gross mismanagement and his failure to properly warn students and

employees, as well as the massive costs incurred by students and, of course, the American taxpayers. A copy of this letter is attached hereto as **Exhibit B**.

24.     The Receiver's decision to abruptly close campuses also resulted in ECA's teachers and other employees losing their jobs.  These injuries gave rise to class action litigation now pending in United States District Courts.  *See. e.g.*, *Garcia et al. v. Willis Stein and Partners*, et al., Case No. 18-cv-621 (E.D. Tex.). Naturally this litigation compounded claims against ECA's Estate, further threatening creditor recoveries.

         **C.**       **Receiver's Failure to Properly Manage Estate Assets**

25.     In September 2018, ECA's accounts receivable (the "Accounts Receivable") were valued on ECA's balance sheet at $52.7 million (net of reserves).  These Accounts Receivable were predominantly monies owed from students, many of whom had graduated and received their degrees.  However, the Receiver's failure to manage ECA as an ongoing concern and abide by the DOE's requirements for "teach-out plans" essentially gave rise to claims from state attorneys general and others that the Accounts Receivable must be discounted since students across the nation were left adrift after the Receiver suddenly closed campuses.

26.     After twelve months of managing ECA's Estate, the Receiver was only able to generate $400,000 from the sale of the Accounts Receivable.

27.     The Receiver also failed to properly manage the millions of dollars in personalty assets that ECA owned, and which served as valuable collateral to the Estate's secured creditors.

28.     In September 2018, ECA's personalty—including, without limitation, its equipment, teaching materials, desks, chairs, office equipment, computers, simulator, and kitchen equipment from campuses across the country—was valued at $37.8 million (net of depreciation).

29.    During the Receivership, the Receiver obtained authority to terminate ECA's leases at over seventy campuses where ECA's personalty was located. Prior to doing so, however, the Receiver failed to properly evaluate the personalty at each location and make appropriate arrangements for the preservation and protection of ECA's property.  In fact, the Receiver simply abandoned valuable collateral and permitted others, including landlords and former employees, to seize such collateral.  Likewise, the Receiver failed to properly protect these assets from looters and thieves who were able to enter ECA's premises and simply walk off with Estate property.

30.    As the senior secured creditor, Monroe was then forced to step in and attempt to locate remaining personal property so that it could be liquidated for the benefit of ECA's creditors.

31.    The Receiver's failures cost ECA's Estate millions of dollars.  At the time ECA's remaining personalty was ready for liquidation, it was valued at only $8.4 million and generated little more than $3 million at sale, before liquidation costs. The liquidation process was also more costly and less efficient due to the Receiver's disorganization and mismanagement.

### III.    The Current Status of Receivership and Receiver's Conflict of Interests

32.    All of ECA's campuses were closed by mid-December 2018, and almost all of ECA's assets have been liquidated or abandoned.  ECA has no current employees, operations or other assets other than the D&O Claims. Despite being given the ability to pursue such claims in the Receivership Order, however, the Receiver has taken no meaningful steps to pursue the D&O Claims.

33.    The Petitioning Creditors believe that ECA possesses strong claims against its officer and directors for damages resulting from negligence, breaches of fiduciary duty and other misconduct. Critically, the D&O Claims are covered by insurance that may provide up to $80 million in coverage.

IMPAC 6565502v.1

34.     For the past nine months, Monroe and its counsel have consulted with the Receiver regarding the value of the D&O Claims and the need to diligently prosecute these claims to secure value for ECA's creditors.  In the spring of 2019, Monroe approached the Receiver to discuss funding the Receiver's pursuit of the D&O Claims since ECA's resources were scarce and the D&O Claims remained the principal source of recovery for ECA's creditors.  However, the Receiver's purported pursuit of the D&O Claims was troubled from the outset.

35.     The Receiver failed to protect and secure properly critical assets and evidence necessary for prosecution of the D&O Claims.  Like the collateral described above, the Receiver wholly failed to secure properly ECA's servers, databases and other critical repositories of evidence (including countless emails, documents, and other evidentiary materials). The Receiver's failures include, *inter alia*, permitting the insurer for the putative defendants to hold and maintain such repositories. This is patently improper and demonstrates the Receiver's negligence in connection with this critical asset.  The Receiver permitted the lead insurer to host and/or maintain the very evidence needed to demonstrate a multi-million dollar liability on the D&O Claims. Such conduct constitutes an unwaivable conflict of interest and demonstrates the Receiver's unfitness to prosecute the D&O Claims.

36.     Additionally, the Receiver failed to protect the interests of ECA's Estate by failing to pursue the D&O Claims in good faith or in any reasonable and timely fashion.  On May 23, 2019, the Receiver entered into a Common Interest Doctrine Agreement (the "Common Interest Agreement") that was explicitly designed to permit Monroe, as secured creditor, to review information and materials in connection with the anticipated D&O Claims.  The Receiver refused to perform under that agreement and, instead, continued to delay pursuit of the D&O claims.[3]

---

[3]     On January 27, 2020, the Receiver formally withdrew from that agreement.  See **Exhibit C** attached hereto.

IMPAC 6565502v.1

37.    Then, in November 2019, the Receiver negotiated a Cooperation Agreement with Monroe, which the parties advanced towards execution.  However, only after Monroe inquired as to the status of the Receiver's signature on the agreement did Kennedy disclose that he had begun secret negotiations with ECA's insurer to try and settle the claims.  Thus, rather than diligently pursuing the D&O Claims as contemplated by the Common Interest Agreement and Cooperation Agreement, the Receiver has engaged in backroom conversations with the insurers in an attempt to shortchange the interests of ECA's Estate and its creditors by settling with the D&O Claims for less than their true value.

38.    Importantly, the Receiver's reluctance to aggressively pursue the D&O Claims comes as no surprise.  As a state senator, one of Kennedy's key legislative victories has been the passage of Georgia HB 192 (2017), for which Kennedy was the senate sponsor. HB 192 amends (and limits) the duties of care for officers and directors in corporations.  Stated simply, HB 192 increases the burdens required to hold officers and directors liable for injuries done to the corporation and shareholders – that is, Kennedy's sponsored law gives more protection to directors and officers.  In fact, Kennedy even earned a A+ rating from the Georgia Chamber of Commerce for his sponsorship of this law.[4]

39.    In order to ensure that the D&O Claims are adequately and timely pursued, the Petitioning Creditors filed an involuntary petition for chapter 11 against ECA on January 6, 2020.

## IV.    The Receiver's Machinations since the Involuntary Petition was Filed

40.    The Receiver's conduct since the Petitioning Creditors filed the involuntary petition underscores his debilitating and ongoing conflicts of interest. Despite admitting that ECA has no

---

[4]    Kennedy's sponsored legislation was signed into law on May 9, 2017 and became effective on July 1, 2017.

remaining assets other than prosecuting causes of action, including the D&O Claims,[5] the Receiver is vehemently fighting to preserve his control over ECA's affairs, as overseen by the District Court.

41.    On January 27, 2020, the Receiver filed an *Emergency Motion to Clarify the Court's Order Appointing Receiver and Related Relief in the District Court* (the "Emergency Motion").  In the Emergency Motion, the Receiver sought to clarify that the Receivership Order provided him with authority to act on behalf of, and to take all actions and exercise all rights of ECA, to oppose the Petitioning Creditors' involuntary petition. In support of the Emergency Motion, the Receiver sought and obtained a resolution from the ECA's board of directors (i.e., from the very individuals that are the target of contemplated litigation), wherein ECA's board purportedly agreed that the involuntary petition is not in the best interests of ECA's creditors, that ECA lacks resources to defend the involuntary petition, and that ECA requests that the Receiver assume the defense of the involuntary petition on behalf of ECA. *See* Education Corporation of America Consent in Lieu of a Special Meeting of the Board of Directors dated January 27, 2020 at p. 2, attached hereto as **Exhibit D.**

42.    In other words, the Receiver essentially got ECA's directors to agree that they would rather have the Receiver, who disavowed the Common Interest Agreement with Monroe, pursue the D&O Claims than a disinterested, and more appropriate, third party. The Receiver is the directors' plaintiff of choice for claims against themselves.

43.    On January 28, 2020, the day after filing the Emergency Motion, the Receiver filed a status report in the Receivership and provided a 13-week cash flow budget.  A copy of the budget is attached hereto as **Exhibit E**.    The budget indicates that the Receiver currently has approximately $344,000 in cash (of which $58,000 is not property of ECA).  The Receiver projects

---

[5]    *See generally* Receiver's Motion for Abstention from Involuntary Petition under 11 U.S.C. § 305, or Alternatively Dismissal under 11 U.S.C. §§ 303 & 1112(B).

to spend $249,000 of the $286,000 remaining on "professional" fees during the 13-week period and just $27,000 on expenses to preserve records and documents.   The Receiver intends to spend the last of the cash fighting Monroe, not pursuing the D&O Claims.

44.     Monroe filed a limited objection to the Emergency Motion to object to mischaracterizations of Monroe's conduct contained therein. Monroe further requested that the proposed order submitted by the Receiver in support of the Emergency Motion remove language allowing the Receiver to use Receivership assets (i.e., Monroe's cash collateral) to retain new counsel to oppose the involuntary petition. Notably, Monroe did not request that the District Court restrict the Receiver's ability or authority to defend the involuntary petition on behalf of ECA, or work with his present counsel to do so.   However, after mismanaging ECA's assets in the Receivership and crippling creditor recoveries, the Receiver and his professionals have still managed to reap over $700,000 from Receivership assets for themselves and plan to consume what remains. Monroe's request that ECA's assets and its cash collateral not be further depleted from the payment of retainers was reasonable under the circumstances.

45.     On February 3, 2020, the District Court granted the Emergency Motion.

## RELIEF REQUESTED

46.     By this Motion, the Petitioning Creditors seek entry of an order appointing a chapter 11 trustee for ECA pursuant to section 11 U.S.C. § 1104(a)(2).

## BASIS FOR RELIEF

47.     Upon the request of a party in interest and following notice and a hearing, the Court shall appoint a trustee "(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . . ; or (2) if such appointment is in the interests of

14

creditors, any equity security holders, and other interests of the estate . . . ."  11 U.S.C. § 1104(a).

Where a court finds either that cause exists or that appointment is in the interest of creditors, an

order for the appointment of a trustee is mandatory. *In re W.R. Grace & Co.*, 285 B.R. 148, 158

(Bankr. D. Del. 2002).

## A.    The Court Should Appoint a Chapter 11 Trustee for Cause Under Section 1104(a)(1).

48.    The categories enumera in 11 U.S.C. § 1104(a)(1) "cover a wide range of conduct"

and, thus, are best described as illustrative, rather than exclusive. *In re Marvel Entm't. Corp.*, 140

F.3d 463, 472 (3d Cir. 1998) (internal quotations omitted). Fraud, dishonesty, incompetence, and

gross mismanagement of a debtor's business affairs are all grounds for appointment of a chapter

11 trustee under § 1104(a)(1). *See, e.g.*, *In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989);

*In re Colby Constr. Corp.*, 51 B.R. 113, 116-18 (Bankr. S.D.N.Y. 1985). The determination of

whether cause exists is discretionary; it must be taken on a case-by-case basis, taking into account

all relevant factors and the totality of the circumstances. *See Sharon Steel*, 871 F.2d at 1225, 1228.

49.    While gross mismanagement and incompetence are the most common reasons

supporting appointment of a trustee, *see In re Sharon Steel Corp.*, 86 B.R. 455, 458 (Bankr. W.D.

Pa. 1988) *aff d*, 871 F.2d 1217 (3d Cir. 1989), other factors, although not explicitly enumerated,

are also considered:

> In determining the existence of cause, courts should consider
> enumerated and similar grounds in the context of the totality of the
> circumstances, including such things as management's competence
> and the quality of its business decisions, strategies and tactics; the
> debtor's policies, procedures and accounting practices; any financial
> improprieties; failure to maintain adequate records or to provide
> timely reports; the debtor's business with related parties; conflicts
> of interest; the actual or perceived dishonesty of debtor's
> management; and acrimony or loss of trust and confidence between
> the debtor and its creditors or employees or other parties with whom
> the debtor does business. No single circumstance is necessarily

> determinative, and the importance ascribed to any particular circumstance must be considered in light of the whole.

*In re Railyard Co., LLC*, No. 15-12386-J11, 2016 WL 1254998, at *11 (Bankr. D.N.M. Mar. 30, 2016).

50. As the foregoing recitation of the Receiver's extensive failures makes clear, cause exists to support the appointment of a trustee because the Receiver has failed to protect the assets and interests of ECA's Estate in the Receivership.[6] The Receiver's failure to work constructively with the DOE caused the loss of Title IV funding and led to the premature shut down of ECA's campuses and significant revenue loss. This set off a cavalcade of additional damages, including discounting of Accounts Receivable and a failure to preserve and protect ECA's personal property that remained at the campuses as they were being wound down. These failures alone caused millions of dollars in losses to the Estate and its creditors.

51. Apart from the Receiver's mismanagement and failure to preserve the value of ECA's hard assets, the Receiver has also failed to secure and protect evidence needed to prosecute the D&O Claims. Even worse, when the Receiver took steps to secured such evidence, it placed that evidence under the control of the lead insurer, who represents the key (if not exclusive) source of recovery. This massive lapse of judgment (whether intentional or otherwise) demonstrates the Receiver's unfitness to prosecute the D&O Claims. Moreover, the conflicts of interest presented by these facts inevitably disqualify the Receiver from serving as the representative of ECA's estate in connection with the D&O Claims.

---

[6] Nothing contained herein should be construed as an admission that the Receiver is tantamount to, or the operating as the debtor-in-possession. All rights with respect to the *Receiver's Emergency Motion for Entry of an Order (I)(A) Confirming that Receiver is not Required to Comply with Bankruptcy Code § 543, Or, in the Alternative, (B) Excusing Receiver's Compliance Therewith Pursuant to Subsection 543(d)* are reserved.

IMPAC 6565502v.1

52.     These acts and omissions constitute gross mismanagement of ECA, at a minimum. These reasons compel the immediate appointment of a chapter 11 trustee.

53.     Moreover, since the filing of the involuntary petitions, the Receiver's conflicts of interest have only become more apparent.  Rather than work with the Petitioning Creditors to transition ECA's remaining assets to the bankruptcy proceeding, the Receiver has sought to entrench himself as the sole party in control of ECA's assets.  First, on January 27, 2020, he withdrew from the Common Interest Agreement, citing a lack of common interest between the Receiver and Monroe, one of the creditors to whom he owes a fiduciary duty.

54.     Second, that same day he filed the Emergency Motion seeking to "clarify" that the Receivership Order permitted the Receiver to respond to the involuntary petition on behalf of ECA. In reality, that motion sought to modify the Receivership Order to give the Receiver additional powers he did not originally possess under the Receivership Order.  In support of that modification, the Receiver submitted resolutions from the very targets of the D&O Claims granting the Receiver the ability to "exercise all rights of the Corporation as a 'debtor' under . . . the Bankruptcy Code. . . ."  Emergency Motion, at Ex. 3, p. 2.  By aligning himself with the targets of the D&O Claims against the Petitioning Creditors to stop this bankruptcy proceeding from moving forward, the Receiver has demonstrated that he is no longer acting in the best interests of ECA or its creditors. *See In re Intercat, Inc.*, 247 B.R. 911 (Bankr. S.D. Ga. 2000) (appointing chapter 11 trustee for "cause" in part because management would not investigate potential targets of litigation in the manner a disinterested person would); *In re Soundview Elite, Ltd.*, 503 B.R. 571 (Bankr. S.D.N.Y. 2014) (finding cause existed to appoint chapter 11 trustee, in part, because management had conflict of interest and could not be expected to investigate themselves).

55.    Third, the Receiver's budget makes it clear that he intends to spend the remaining cash on his professionals.  The Receivership is at a critical juncture and the Petitioning Creditors can no longer tolerate continued depletion of the estate without maximizing recovery of ECA's most lucrative asset. If there has been any activity on the D&O Claims at all, the Receiver has operated in the shadows, with little communication with ECA's largest creditor.  Given that the Receiver has commenced no litigation to date, has refused to accept additional funding from Monroe, and has a limited amount of remaining assets, his decision to allocate almost all of his remaining funds to professional fees in such a short time period shows the Receiver's true intentions in defending against the involuntary petition on ECA's behalf.

56.    After aligning himself with the lead insurer prior to the commencement of this bankruptcy proceeding, the Receiver, just in these past few weeks, has now also aligned himself with the board members who are the targets of the D&O Claims in an effort to improve his chances of defeating the involuntary petition.  These entrenchment motives, combined with the Receiver's existing conflicts of interest and his recent decision to withdraw from the Common Interest Agreement entered into with creditors to whom he owes fiduciary duties, demonstrate that the Receiver is not acting in the best interest of ECA or its creditors and provides ample additional support for the appointment of a chapter 11 trustee.

**B.    The Appointment of a Chapter 11 Trustee Is in the Best Interest of Creditors Under Section 1104(a)(2).**

57.    Even if the appointment of a chapter 11 trustee for cause is not required based on the foregoing mismanagement and conflicts of interest, the appointment of a trustee is still in the interest of creditors under section 1104(a)(2) of the Bankruptcy Code for several reasons.

58.    First, there is no management to serve as a debtor-in-possession.  There are no remaining officers, directors or employees of ECA.  All such individuals terminated their

association with ECA long ago.  All that is left is the Receiver.  He is neither a debtor-in-possession

nor a trustee under the Bankruptcy Code; but rather, a "custodian" under the Bankruptcy Code.

*See* 11 U.S.C. § 101(11)(a).  Nor can a receiver be appointed under the Bankruptcy Code because

section 105 of the Bankruptcy Code expressly prohibits such appointment.  *See* 11 U.S.C. § 105(b)

("[A] court may not appoint a receiver in a case under this title.").

59.    Second, the Receiver has not made meaningful progress toward the investigation

and prosecution of ECA's litigation claims in over a year.  While the Receiver has liquidated

ECA's real estate and wound down ECA's business, the prosecution of estate causes of action

requires a different mindset and a different type of expertise.  That is especially true where, as

here, the potential causes of action to be brought include causes of action under chapter 5 of the

Bankruptcy Code, which are more properly brought by a party with more extensive bankruptcy

litigation experience.  With the Bankruptcy Case pending in Delaware, a chapter 11 trustee more

familiar with Delaware and Third Circuit law on avoidance actions under chapter 5 is preferable

to the Receiver, who is located in Georgia and has conflicts of interest with respect to the D&O

Claims.

60.    Third, Monroe, and its other affiliates who are ECA's largest remaining creditors,

support the appointment of a chapter 11 trustee and are prepared to fund the litigation, provided

that such a trustee is put in place.  As significantly undersecured creditors, Monroe and the other

Petitioning Creditors do not believe that the Receiver is the best person to pursue these claims due

to the conflicts of interest described above, and are unwilling to provide additional funding to ECA

if the Receiver remains in place.  This lack of support from ECA's key creditors, standing alone,

provides ample support for the appointment of a chapter 11 trustee.

IMPAC 6565502v.1

61.     Fourth, the involvement of the Receiver is no longer necessary.  ECA has no remaining operations, no employees and no assets to liquidate other than the litigation claims.  The Receiver's role in winding down and liquidating ECA's assets did not provide him with any unique or specialized knowledge that would make him better suited to oversee the forthcoming litigation claims than a more specialized chapter 11 trustee that has the support of ECA's creditors.  Any remaining items under the control of the Receiver can easily be transitioned to a chapter 11 trustee, once appointed.  Moreover, the reasons underlying the Receivership Motion—namely the preservation of students' access to Title IV funding—is no longer present.

**WHEREFORE**, the Petitioning Creditors request that the Court enter an order substantially in the form attached hereto and grant such other and further relief as it deems just and proper.

Dated:  February 4, 2020
        Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

*/s/ R. Stephen McNeill*
Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
1313 North Market Street, Sixth Floor
P.O. Box 951
Wilmington, Delaware  19801
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  jryan@potteranderson.com
        rmcneill@potteranderson.com

  -and-

**VEDDER PRICE P.C.**
Michael M. Eidelman *pro hace vice pending*
222 N. LaSalle Street, Suite 2600
Chicago, Illinois  60601
Telephone:  (312) 609-7500
Facsimile:  (312) 609-5005
Email:  meidelman@vedderprice.com

*Attorneys for the Petitioning Creditors*