# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE



**BRENDAN LINEHAN SHANNON**
**JUDGE**

**824 N. MARKET STREET**
**WILMINGTON, DELAWARE**
**(302) 252-2900**

February 5, 2020

Jeremy W. Ryan, Esquire
Potter Anderson & Corroon LLP
1313 N. Market Street
P.O Box 951
Wilmington, DE 19801

Daniel J. DeFranceschi, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801

David L. Buchbinder, Esquire
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
Suite 2207
Wilmington, DE 19801

        Re:    In re: Education Corporation of America
                Case No. 20-10034 (BLS)

Dear Counsel:

      The parties have jointly contacted Chambers to request a hearing date for trial on the Receiver's Motion for Abstention from Involuntary Petition Under 11 U.S.C. Section 305, or Alternatively Dismissal Under 11 U.S.C. Sections 303 & 1112(b) [Docket No. 10] (the "Motion to Dismiss").[1] From discussions on the record at our telephonic status conference on January 29, 2020, the Court also anticipates that the petitioning creditors may shortly file a motion for the appointment of a Chapter 11 Trustee.

---

[1]     It is now clear beyond peradventure that the Receiver has authority to fully participate in proceedings in this Court by virtue of a truly epic Order entered by the United States District Court for the Middle District of Georgia on February 3, 2020. *See VC Macon, GA LLC v. Virginia College LLC et al.*, C.A. No. 5:19-cv-00388-TES (MDGA Feb. 3, 2020) [Docket No. 327], a copy is attached hereto.

Jeremy W. Ryan, Esquire
Daniel J. DeFranceschi, Esquire
David L. Buchbinder, Esquire
February 5, 2020
Page 2

The parties have requested a full day hearing in mid-March 2020, and will presumably undertake comprehensive discovery and briefing in advance of that trial. The undersigned believes that it would be appropriate to promptly conduct a further status conference, pursuant to 11 U.S.C. § 105(d), for the purpose of assessing both an appropriate path forward, as well as the wisdom of this entire exercise.[2] Accordingly, the Court will hold a status conference on February 6, 2020 at 11:00 a.m. Eastern Time. Out-of-town counsel are welcome to participate by phone; Delaware counsel are expected to appear in Court.

Very truly yours,

Brendan Linehan Shannon
United States Bankruptcy Judge

BLS/jmw
cc:     The Honorable Tilmon E. Self, III (via email)

---

[2]     *See* 11 U.S.C. § 303(i).

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| VC MACON, GA LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>VIRGINIA COLLEGE LLC, and EDUCATION CORPORATION OF AMERICA,<br><br>*Defendants.* | CIVIL ACTION NO.<br>5:18-cv-00388-TES |

## ORDER CLARIFYING THAT THE RECEIVER MAY ACTUALLY APPEAR IN BANKRUPTCY COURT TO DEFEND THE RECEIVERSHIP ESTATE

Over 14 months ago, the Court entered its Receivership Order appointing John F. Kennedy as Receiver over the Receivership Estate of Education Corporation of America ("ECA"); Virginia College, LLC ("VC"); and New England School of Business and Finance ("NECB", collectively with ECA and VC, the "Receivership Entities"). [Doc. 26]. Within those 14 months, the Receiver and his team have successfully undertaken a myriad of tasks, each and everyone of them for the benefit of the Receivership Estate's creditors and stakeholders, specifically including Monroe Capital, the sole entity lodging objections to this Motion.

In addition to closing VC's 74 physical teaching locations, the Receiver has also liquidated all of VC and ECA's assets, sold NECB,[1] instituted a carefully thought-out claims process that to date has logged some 2,000 pending claims against the Receivership Estate, nearly completed the wind-down process of the Receivership Estate in cooperation (including an exhaustive audit) with various state and federal agencies, and worked to terminate the 401(k) and pension plans of the Receivership Entities. In fact, the Receivership Estate now only has one asset left: a claim against the Directors and Officers of ECA that happens to have an insurance policy with up to $80 million in coverage.

As the Receivership Estate's largest secured creditor, Monroe Capitol[2] has understandably taken a keen interest in the case—and the insurance money. In fact, during these 14 months, Monroe has communicated extensively with both the Receiver and the Court regarding the course this highly unusual case has taken. In large part, Monroe hasn't disagreed or objected to anything that the Court has ordered. And, from

---

[1] Ironically, Monroe Capital, the entity opposing the Receiver defending the Receivership Estate in a Delaware Bankruptcy Court, purchased NECB.

[2] Any reference to "Monroe Capital" throughout this Order encompasses each entity named in the Rider attached to the Proof of Claim filed on April 16, 2019, to wit: Monroe Capital Corporation, Monroe Capital Senior Secured Direct Loan Fund LP; Monroe Capital Senior Secured Direct Loan (Unleveraged) LP; Monroe Capital Private Credit Fund II, LP; Monroe Capital Private Credit Fund II (Unleveraged), LP; and Monroe Capital Partners Fund LP. [Doc. 321-3 at pp. 143, 145]. Ostensibly, Monroe Capital Management Advisors, LLC, the entity formally opposing the Receiver's Motion, is the administrative and collateral agent for each of these entities.

the Court's perspective, Monroe and the Receiver have been mutually beneficial partners.

But the good ole days of Monroe and the Receiver working together are apparently over. After allowing the Receiver (and the Court) to complete the vast majority of the heavy lifting regarding the closure and successful wind down of the Receivership Estate, Monroe Capital Private Credit Fund II LP and two other creditors—Reputation Partners LLC and BSF Richmond, LP ("Petitioning Creditors)—filed an involuntary petition for Chapter 11[3] bankruptcy against ECA in Delaware.

On the face of their involuntary bankruptcy petition, the Petitioning Creditors name ECA as the sole debtor[4], but notably list "John F. Kennedy, Receiver" as the "care-of" recipient for correspondence related to their involuntary petition. [Doc. 138-1 at p. 1]. And they should have. Because the Court placed the Receivership Entities under a federal receivership, i.e., under the control and direction of the court itself, Mr. Kennedy effectively controls them.

However, Monroe apparently now takes the position that the Court's Receiver does not have the authority to contest its involuntary bankruptcy petition. As in, the

---

[3] Given that only one asset remains in the Receivership Estate and absolutely none of the Receivership Entities continue to operate as a going concern, the Court struggles to understand exactly what there is to reorganize. But, the Court digresses.

[4] The Petitioning Creditors have only sought to take ECA into bankruptcy, not VC and NECB. Understandably, Monroe did not include NECB in its Involuntary Petition since it bought NECB from the Receivership Estate, considerably later than the day Monroe identifies as the last date that any reason existed for the Receivership. [Doc. 322 at ¶ 3].

3

Receiver isn't allowed to even show up or make an appearance.[5] So, the Receiver has now filed an Emergency Motion to Clarify [Doc. 318] the Court's Receivership Order, asking the Court whether that Order prohibits the Receiver from opposing the involuntary bankruptcy petition filed against ECA. [Doc. 138 at p. 7]. Short answer: it absolutely does not.

Specifically, the Receivership Order provides that "[i]n the event of an involuntary filing of a petition or any equivalent thereof against ECA under the Bankruptcy Code, ECA shall have standing to and may defend against the entry of an order for relief and Receiver may *support* ECA's defense with respect to such involuntary petition." [Doc. 26 at p. 12 (emphasis added)].

While the motive behind the Petitioning Creditor's actions is unclear, what is crystal clear—via Monroe's Response [Doc. 322] to the Receiver's Motion—is that it (and the other Petitioning Creditors) objects to the Receiver's participation in the involuntary bankruptcy proceedings despite *specifically naming him* in their petition. *See* [Doc. 138-1 at p. 1]. Yet, who else would do it after all these months of work, ECA? No—all of its authority was effectively stripped away when it asked the Court to place it under receivership.

---

[5] Monroe doesn't expressly say that the Receiver doesn't have the authority to answer on behalf of the Estate in its court filings, but there clearly must have been some discussion between the Receiver and Monroe as to that point or else the Receiver would not have decided to file this Motion to clarify that he does have such authority. *See* [Doc. 318 at ¶ 12].

4

Essentially, Monroe brazenly seeks to harness the full power of a United States District Court to prevent its named opponent from defending itself in a faraway forum it unilaterally selected. Think about that.[6] And to take it a step further, Monroe also objects to the Receiver's "expenditure of limited Receivership Estate assets . . . to oppose the involuntary petition for bankruptcy." [Doc. 322 at p. 2]. To better illustrate the audacity of these requests, the Court offers the following hypothetical.

Let's compare this case to a recent college football game. Suppose that the National Collegiate Athletic Association, the NCAA, announced that the Baylor University Bears (for this analogy, Monroe) would face off against the University of Georgia Bulldogs (the Receiver) in the Sugar Bowl in New Orleans, Louisiana (the Middle District of Georgia). Then assume that well after all of the preparation for the game by the Sugar Bowl Committee, Baylor just decides it wants to move the game to its home field in Waco, Texas. Now, with its preferred playing field, or forum, in hand, it takes its plan one step further—Baylor goes to a federal court in Waco for an order preventing Kirby Smart, the Bulldogs' head coach, from even allowing his team to get on the bus to play in Waco. Then, just to be sure that Baylor will win, it also asks the federal judge in Waco to rule that if the judge allows the Dawgs to go to Waco, Coach Smart must use his own private funds to get the team there—no University of Georgia

---

[6] The Court notes that nowhere in its two-page Response does Monroe cite any legal authority to justify a federal court preventing an opposing party from even defending itself in court. See [Doc. 322 at pp. 1–2].

money can be used.[7] Such actions by Baylor would be nothing short of laughable, right? Yet, here we all are.

Monroe provides neither reasoning nor legal authority for its novel position that the Receiver cannot defend himself in the Delaware courts. Although Monroe now apparently thinks the Court has no reason to continue the Receivership, it hasn't moved the Court to dissolve the Receivership since it arrived at this conclusion. Instead, Monroe now wants to move the litigation to Delaware. That question will have to first be decided by a bankruptcy judge in that court. But one thing is for sure, Monroe will have an opponent – and he will be funded.

Accordingly, pursuant to 28 U.S.C. §§ 2001, 2002, and 2004, Rule 66 of the Federal Rules of Civil Procedure, as well as the Court's broad equitable powers, the Court, after a reasonable opportunity for Monroe to object and be heard regarding the Receiver's requested relief, **GRANTS** the Receiver's Emergency Motion to Clarify [Doc. 318].

In doing so, the Court finds that when it entered the Receivership Order, ECA was a going concern and had employees; officers; and an acting, engaged board of directors and intended to propose a plan to reorganize in this Receivership. At that time, it was contemplated that these individuals would continue to be actively engaged in the operations and management of ECA (including the ability to oppose the filing of

---

[7] This modern version of the "Monroe Doctrine" might have been the only thing that could have stopped LSU last year.

an involuntary petition of bankruptcy against ECA), subject to this Court and the Receiver's oversight and involvement pursuant to the Receivership Order. However, ECA no longer has any employees, its officers have resigned, many of its directors have resigned, and its board nonetheless has been inactive since the closure of ECA's institutions and the implementation of the necessary wind down in December of 2018. Thus, to be clear, the Court declares and determines that the Receivership Order grants the Receiver the unilateral authority to oppose the Involuntary Petition on behalf of and in the shoes of ECA, and to take all actions and do all things necessary to support ECA's defense of the involuntary bankruptcy petition. And, the Receiver may use Receivership Estate assets to do so.

Consistent with the relief requested in the Receiver's Motion, the Court **ORDERS** that the language from the Receivership Order, including the language set forth in paragraph 12 of that Order, authorizes the Receiver to unilaterally act on behalf of, and to take all actions and exercise all rights of ECA, to oppose the involuntary bankruptcy petition, and take all such actions as the Receiver deems necessary and appropriate in his business judgment in furtherance thereof, specifically including the authority to use Receivership Estate funds as allowed by the Order. Further, the Court **ORDERS** that this court shall retain jurisdiction over any and all matters or disputes

arising from or relating to the implementation of this Order.

**SO ORDERED**, this 3rd day of February, 2020.

S/ Tilman E. Self, III<br>
**TILMAN E. SELF, III, JUDGE**<br>
**UNITED STATES DISTRICT COURT**